Good morning, Your Honors. Solomon and Sarah are preparing for the event. Thank you, ladies and gentlemen. Hello. I'm going to ask that you reserve five minutes of my time for rebuttal. Your Honor, the touchstones of the federal securities laws has always been full and fair disclosure of all material information to allow investors to make informed decisions as to securities transactions. That means that there must be disclosure of matters that are specifically identified by an issuer as being relevant to their business operations. In this case, Aruba voluntarily injected into the discussions that, again, we had with analysts on quarterly earnings conference calls and technology conferences the status of its competition with its principal competitor, Cisco Systems. And in so doing, it was required, certainly under the recent Omicare decision and other Rafter decisions, including the sports-based arena pharmaceuticals decision, to make a full and complete disclosure of what was going on with Cisco. And in fact, that didn't happen here. And the lead plaintiff and the members of the class were misled by the omissions of the executive officers of Aruba in failing to describe the status of the competition. Aruba's own 10-K annual report identified the loss of significant customers as a major risk factor. However, there was never any disclosure in a 10-K, in a quarterly report, in any conference calls with analysts, in any report whatsoever of what the reality was with its most significant customers. The district court made reference to the fact that Aruba had thousands of customers. Respectfully, that's an irrelevance. The defendant or the CEO of the company himself publicly acknowledged that Aruba was dependent on large enterprise customers for its revenues. Is there a responsibility? I understand that there's a responsibility, perhaps, with regard to not making misstatements about your own. I mean, for example, if you're losing customers. But in the same sense, the market would be responsible for defending investors for whatever investigation of Cisco is necessary. Why is Aruba responsible for telling its investors what Cisco's doing as opposed to the investors finding out what Cisco's doing? Because it identifies Cisco as its principal competitor in its public filings. The investors are open market investors, such as my client. They have no ability to ferret out the information that the executive officers have sitting in the executive suite. They have no ability to know, for example, that Aruba lost J.C. Kennedy, who was a major client in August of 2012. They have no ability to know that MGM was lost. Okay, probably because I can. No, no, you already could not find out because it was never disclosed. Public investors have no knowledge of the customer listed at Aruba. They're wholly dependent on the faith of the Aruba executives to reveal this type of information. And it's especially critical here, Your Honor, because they talked about loss of significant customers being a risk factor. They talked about, openly, because analysts were present. Analysts, in a way, were acting as the proxies, if you will, for public investors in earnings calls. They were purely pressing executive officers of Aruba to tell them, what is going on right now with Cisco? Where do things stand? Everyone, this was the elephant in the room. Everyone knew that this was the most critical aspect of this company's business. It's not about thousands of customers. It's about the large enterprise customers that this company was dependent upon for its revenues. One customer to meet tens of millions of dollars. When Aruba lost GCPenney, they lost a $50 million account. This is a $500 million a year company, basically, at the time it existed. It didn't survive. It was swallowed up subsequently by Hewlett-Packard because of these events. And the fact of the matter is, customers have, certainly stock purchasers like my client, have no ability to know this. They're reliant on disclosures that are required under Omnicare, under a whole supply of authority. That's the notion of a securities bonus. This type of information, when it's voluntarily injected into the market by Aruba, they need to make full disclosure. They can't sit on information that's in the matters of investors and B material. This is somewhat similar to the Arena Pharmaceuticals case recently issued by this court. In that case, you've got a company that was talking about a drug they had and they had some studies that were done about the drug. And they talked about those studies. They also had something that was referred to in their decision as a rat study, which showed that there were cancerous tumors being generated by this drug. They didn't talk about that at all. And this court said, when it was injected into the discussion about the status of this drug and the drug tests, they need to disclose everything that relates to the consequences of the use of the drug. Well, similarly here, Cisco is the elephant in the room. It's openly discussed repeatedly by the executive officers. They're hiding the information that's going to matter to public investors. And the analysts are talking in their reports about Cisco being an aggressive competitor. What exactly is it? You can tell me what's hidden. That they lost three large enterprise customers that were material to their bottom line during the class period. They lost Jason Petty. They lost MGM Grand. And the largest one of all, they lost Safeway. They, instead of disclosing the loss of these large enterprise customers, which is critical, according to the CEO himself and several of the disclosures he sent to the company, was dependent on that. Instead of that, they lied. They repeatedly lied by saying, we're winning everything. Our trend is up. We're gaining share. If you look at it, there are seven specific points to a specific statement. Yes, Your Honor, November 15, 2012. There are seven statements in the case, and I'm going to focus on this one. November 15, 2012. In Ernie's call with regards to the first quarter of 2013, the CEO says, we are winning every deal we see. That's untrue. We just lost our most critical material deals. That is a false statement. And if anything, it creates a false impression because it suggests that the company is on the verge of negatively impacting its business. And it shouldn't be disregarded that there are multiple, no less than 11 confidential witnesses in this case who have come forward and said, several of them have said, on that specific call, he lied or lied. These insiders in the company, including the vice president of information technology at Aruba, said that was misleading and false. The fact of the matter is that the statement is, yes, I found the paragraph in your complaint that talks about the November 15 call. Yes, sir. Now, where does he say, we are winning every deal we see? I believe the quote, Your Honor, is in paragraph 75 and 76 of the complaint. And he lies to himself. We're winning almost every deal we see. So far, he says, our win rate against your competitors to hitter was improving steadily every month. There are a lot of general statements here. Almost a matter. Almost what? What's that saying? We're winning every deal. How does he? Your Honor, I think the import of that, as it was taken by analysts who are reporting after these earnings conference calls, is they're confident that there's no material threat to this company from Cisco. That's the message that's being given by these insiders. Well, they're confident they're competing successfully against Cisco. And it looks like the companies have two different strategies, which your complaint talks about. Aruba's looking at the chief information officer. He thinks they can win on technology. And most of the references to winning seem to talk about our technology is better. And it turns out Cisco outflanked them and asked that to the chief financial officer. But I'm not sure that's quite something that Aruba should take as a given as this competition is unfolding. Your Honor, the confidential witnesses are saying the ship is basically sinking. In fact, that was a direct quote from one of them. There are massive defections in the company. They're losing all kinds of salespersons. Now they're laying them off because they're not able to keep up with what they need to do. There is the departure of the general counsel of the company immediately before the shocking earnings announcement that comes and he says, I'm going to be out of here soon and you'll see why. And you've got massive insider selling by these CEOs at the same time that my client and the other members of the class are purchasing stock. So if you put the totality of this together, which is really what is required to be done, you have to look at each of these statements in context. You have to consider the totality of the information that's built. The fact is if you look at another statement card from February 23, February 21, 2013, Melco, the technology officer, says, quote, Cisco has lost interest in competing with us on technological grounds. There's no basis for that statement. Again, the context of that is they have just lost their major enterprise customers. They haven't disclosed that. Now, the district court seems to assume that Arula, in fact, had superior technology, but that's a factual issue. We can test that. That's not true. And the CTO saying Cisco's lost interest in competing with us is blatantly false. And investors such as my client, in hearing that, is assuming that there's all's well, there's no problem. There is this statement, but that's not what the statement says. You're cutting off the last part of it. This is paragraph 81, Your Honor. Okay. And you said, quote, our win rate has not gone down or, in fact, our yield has increased modestly. Cisco's lost interest in competing with us on technological grounds. The impression that's being created by these statements in context with what internally is going on is reflected by the confidential witnesses is diametrically opposite. And, Your Honor, the federal securities laws require better than this. And certainly the recent Obamacare decision, which the district court didn't have the benefit of, actually requires full disclosure of material information such as this. So, Your Honor. Yes, Your Honor. It may appear that one of the problems with competing with Cisco is that Cisco is more competitive than we guessed. And that's not a mention. It's just a part of your intention that by opening the box, you're bumping capacity to face the fact that you can develop a certain technological competition. You still have a major problem that's not being disclosed. Yes, Your Honor. I would agree with that. And certainly, in addition to that, the impact on Aruba's business is Cisco's ability to bundle. Because if you look at the class period, at the end of the class period, their risk disclosure is materially changed. After all the bad news comes out, they change it to say, we can't compete with Cisco's risk disclosure. They're saying that is the disclosure that should have been made earlier in time. This is a factual dispute. This is, we have 11 confidential witnesses. We have a missed earnings guidance statement. There is a multitude of information here to suggest that a false statement was made. Thank you. I'm going to reserve the rest of my time. When you please the court, let me guess you. So I'll say it on behalf of defendant appeals. The district court properly dismissed the second amendment complaint in this action because it failed to meet the stringent requirements of the Securities and Exchange Reform Act. The court was correct in doing so because the complaint failed to meet the formula requirements to plead falsely. The formula was the word used by this court in the manslaughter decision. And the district court gave the plaintiff several opportunities. The plaintiff's couldn't meet that standard. In addition, the complaint was properly dismissed, and the dismissal should be referred on an alternative ground, which is the failure of plaintiffs to raise a strong inference of the required fraudulency entry. In many ways, this is a straightforward case. In May of 2013, a group of plaintiffs results that they just obtained in April quarter estimated that its revenue would be $144 to $147 million. Revenue ended up being $147 to $1 million. This was compared to the guidance they'd given of $159 to $161 million. That less than 10% difference, however, obscures a key fact, which is the company still had growth over the prior year. And what happened to the stock price? The stock price dropped a lot. It dropped substantially. It suggests that investors reviewed the disclosure of the difference between the $159 and the $147 as being material. There was no doubt that there was an amends. Okay, so what goes back to the time the $159 figure was articulated? What was the support for it? Yes, in fact, the company was looking at a nuancy that they had used to resolve several steps. First of all, the class period of April through August, and plaintiffs alleged that these big losses took place in the summer and in the fall of the prior year in 2012. The company had a successful record quarter in October. The company had a successful record quarter in the January quarter. And following that successful record quarter, the company gave guidance as to its expectations for the April quarter. The company recorded a meeting record, record profits to the company, so to speak. Record revenues. Record meetings. The highest revenues. The highest revenues the company had against its earnings from their growth trajectory in the October quarter, it had record revenues. In the January quarter, it had record revenues. And in the February conference call with investors announcing the results of the just-completed January quarter, the company gave guidance. The company missed that guidance. However, that missing guidance is not a fraud, and there are a couple of key things that hostages use. Would it be a fraud if there weren't a basis for it? Well, it would be actionable if several things happened. One, if under those securities of litigation reform and its safe harbor, forward-looking state's burdens are immunized, and this court has explained in the Qatari decision and subsequently in Intuitive Surgical that there are two alternative paths that the safe harbor would be deployed. One is if a statement is accompanied by meaningful cautionary language. Your Honor mentioned some of the cautionary language that the Department of Human Efforts had in its SEC filings concerning competition and concerning the risks. So concerning the fact that this was a much larger, deeper-pocketed company, et cetera, and there are many other risks discussed. So that is sufficient to find that the forward-looking statements are immunized, as this court found in the Qatari case. If that weren't the case, if there were no risks to the inter-server, then it doesn't have to find a safe harbor. They have to show that the statements, or the forward-looking statements, were known to be false at the time. There is no allegation of that. In fact, they just don't put a single internal forecast or conclusion. Not one that contradicts any statement made by any of the individuals. There is no alternative forecast. There is no other forecast. At this point in time, I would like to focus on the statements. I might have tried to ask Mr. Shara, okay, exactly what statements do you focus on in this case? Is there any bidding key facts and so forth? Tell me why those statements he identified don't qualify. Well, I think it's because he was unable to answer your question. In fact, the same issue came up in the district court's hearing where Judge Chabria specifically asked, how is this, for example, the statement that Cisco is not competing anymore? The language which follows the statement about Cisco is that Cisco isn't competing during the logic thing. It just follows it. This is paragraph 81 of the complaint. So I think Cisco is always the choice statement. You see what I mean? The choice statement. Yes, sir. This is on the paragraph 81 of the complaint. It's just below the bolded language, and there's something there. Notable. So I think Cisco's always been formidable. They're formidable from a pricing perspective. They're very aggressive there, and they obviously have a lot of other pieces that they bring into a customer to go at. That goes to the key issues in this case. Cisco is able to compete on a price level. Cisco's a much larger company. It is able to compete at the CFO level, as you mentioned, where Aruba is trying to get the business at the chief technology officer level. Cisco's able to compete in a different way, and it's competing at the chief financial officer level, at a higher level of the company, where perhaps a super-popular competitor, one that you offer discounts, et cetera, might have more power. The discounting of the price pressure is pointedly noted there by Mr. Melvin, in addition. The next sentence is key. They have a lot of other pieces they can bring into a customer, and that goes to your point, Your Honor, about bundling. Aruba was in a single-line business. It focused on wireless networking equipment and services. That's what it did. Cisco, as the plaintiff listens to say on paragraph 3 of the complaint, is the 800-member bundler in this business. Cisco is the largest, according to them, co-provider of computer networking equipment in the world. It is a huge company. It has a little bit of 50% of market share in the wireless access space. The numbers vary, but Aruba is at the 11th or the 15th in this country. So Cisco is a larger and formidable competitor, and, as Mr. Malkoff says, has a lot of the traditional products that they offer. All of these risks were disclosed. They were disclosed prominently by the company, not only in this conference call, but in the very detailed warrants that are contained in the company's SEC files. The plaintiffs cannot avoid those, and nor do they have anything internal in their own internal documents which contradict any of these statements. And what's more, the company's performance refused this. Their theory is that, to quote Mr. Serra's statements a couple of minutes ago, it was a steep shift. The company had record revenues in the October quarter and the February quarter, and following in the April months, and then they had excellent performance. The following year was over 20% growth for that year. And I think that it goes beyond the bounds of that. As you said, the company disappeared. It was acquired for about $3 billion by Hewlett Packard after this period. It did not go bankrupt. It did not disappear. It got acquired for a lot of money. So this was a successful company that had made payments, absolutely. And the fact that the stock dropped in response to that risk is not a fraud. It only says that the future is uncertain and that the company missed its earnings and so forth. Why isn't the complaint about that last meeting an accurate statement? Is there anything in the complaint that suggests that there was information making that projection inaccurate? Plaintiffs don't want to sink on the internal forecast. They don't want the difference from the company's public statements. The only thing they say about internal documents is the company uses a sales force. Sales force is a widely available program to track sales opportunities. That's not saying somebody is using Excel or WordPress. It doesn't say anything about what the expression in the document says. Here, they don't say anything about what the contents of the report. They don't put it in any reports. All they say is that the individual defendant's privacy is on a regular basis. Well, that's their job. They're running the company. But that is not enough. And this court has said repeatedly from Silicon Graphics on in securities cases, it's not enough to say there were internal reports. There are internal reports that the defendants frequently review. You have to say what those reports contained and how those reports materially undermine, materially differ from the company's public statements. Plaintiffs don't do that. They cite a number of confidential witnesses. A lot of those confidential witnesses, they've been from too long ago, are all same-speaking. They don't say anything as to what the individual defendants did. They speculate, oh, Don Moore must have known something. But they don't know. And this court has repeatedly held that mere speculation as to what the defendant might do is not enough. And the CWs here are not in a position to give that context. I have to also address a different point, which is really not something that was discussed at length in the briefs, but I think is important because it was here. Sarah suggests that the Omnicare decision recently, a year ago or so, by the Supreme Court somehow salvaged this plaintiff's case. That is not simple. Omnicare was decided under Section 11 of the Securities Act of 1933, which is a much more obedient standard. Section 11 does not require anything of a fraudulent standard. It is a different statute. However, even if one were to apply Omnicare group rate to a Section 10B case, which would be difficult because much of Omnicare is used in the language of negligence, that would not save plaintiffs a year. Omnicare talks about opinion statements, material opinion statements, just as Kagan in her opinion repeatedly talks about it as a statement of opinion as material. Then it can be actionable in one of two ways. One is it's not genuinely believed by the speaker. There are no allegations to the Supreme Court or Mr. Malkoff did not genuinely believe their statements. I'm sorry. Well, one of the specifics of reading through these statements, they were at least very carefully worded, but you may say that was good that they were carefully worded. They would say things like, you know, we're competing very well on how to do technology, or they would say, the back up was for the optimism was at least narrow as there was articulating. I don't see why that would be a bad thing. That's a good thing, because the campaign... I was dragging up a broader statement that, you know, we're competing very well. And then the next thing is... Well, two things. One, we're competing very well. This is the kind of vague general statement that this Court has repeatedly held is not actionable. It's, for want of a better term, corporate happy talk, like we are bullish, we are optimists, et cetera. And this Court, whether it's... You don't think that did, in case, change the norm and character? No, it did not. Because, Keith, and I've said before, Justice Leavitt's view is that it's got to be a material statement. And this Court, in Qdera, in its research, and in other cases, has said that that kind of vague general statement of optimism is not material, it's not actionable as a matter of law. But beyond that, Your Honor, I think that it's a key thing to note that Aruba was in a market position which faced very large competitors, Cisco, Hewlett-Packard, Motorola, and it could compete in some ways, but it couldn't compete in other ways. It couldn't compete by offering a broad product portfolio, and that was something that was closed. But there's no obligation for Aruba to denigrate its chances or to say, well, gee, the other guys are much bigger, and so we're going to lose. On the contrary, the company competed, and it competed quite successfully. It did have about an 8% miss in its quarterly results from the annual quarter, but it competed successfully before and after. As my time is running out, I'd like to highlight a couple of things. First, I mentioned standard. There's no there, there, in terms of internal contradictory standards. So I think that that's a key problem that the court is facing. Second, they highlight stock sales. The stock sales here were less than 10% or so. This court has, in many instances, discussed the level of stock sales that cause some level of suspicion. We're talking percentages much higher than that. Finally, the district court denies the need to amend. This is the plaintiff's... I'm sorry. ...denies further need to amend. Excuse me. This is the plaintiff's third trial. They adopted the allegations of the first complaint, filed the first amended complaint, which is dismissed. In the dismissal order, the district court said, Give me your next one best shot. And then Judge Chavria, in connection with the second motion to dismiss, the second amended complaint, held a hearing. If you look at the very first paragraph in the discussion of the hearing, Judge Chavria said, I don't know if you've solved the problems here, but walk me through your statements. See if you can open up the hurdle. And they failed to state a claim. He then dismissed the case with prejudice. He does not see how they would further amend. They didn't point to additional frags. And to this day, they haven't. There's nothing in the papers that suggests that they have anything further. Therefore, the court should sustain the dismissal and affirm it, unless you have any further questions. Thank you very much. Your Honor, as my colleague noted, that there are no internal documents that support our allegations. And that's because no discovery is allowed in these federal securities court cases. The claim has been unveiled without the standing guide. That's why there's the emphasis on investigation and the allegations of the confidential witnesses. I would statically suggest to Your Honors that if you read those allegations, they were from confidential witnesses, people who are in positions to know exactly what was happening, had access to the Salesforce software that the CEO had, knew what the CEO knew, and reported it. And it's in the complaint. So they have said, clearly and unquickly, that the positive statements that were made by Orr and Malcote-Galvin during these conference calls were untrue. Counsel said nothing about the loss of the three large enterprise customers. Let's not forget what happened here in this case. Who is that, essentially? Who is your client? Of course, they never said it to Orr. It doesn't even cost them. So you're making it a major thing. Yes. Yes, because once you voluntarily inject a discussion about the status of competition with Cisco, if you don't tell people that we have lost three major enterprise customers to our competitor precisely because of the bundling and the pricing associated with that bundling, then it's materially misleading to do that, to make that omission. Well, it's materially misleading if it affects the overall competition, if not otherwise. And, Your Honor, it did because, again, the class period is marked at the end by a new disclosure from Aruba that was never seen during the class period. The new disclosure is, we cannot compete with Cisco based on its bundling and the concomitant pricing. That's what we're saying should have been told to public investors during the class period. And we feel we should be given a chance to explore that through discovery. And this case is not about puffery. And it's not about, say, the safe harbor forward-looking statements. That's not our case. Our case is not about forward-looking statements. It's about hard information given to analysts who are carefully querying these executives about what exactly is going on with Cisco. And they weren't telling the truth. They were dissembling. We do think we should at least be given a chance to amend, to further flesh this out. It's incorrect to say that we've had three complaints. There were only two. The recent Aretha Pharmaceuticals case, on its base, talks about a Third Amendment complaint opportunity being provided to the plaintiff in that case. And the Ninth Circuit upheld the sufficiency of that complaint. We think we should be given the same opportunity here. These are very complex cases. They're factually intricate. They're hard to please. As the on-case says, we acknowledge that. We think we've played out enough to show that this is a meritorious case and an amendment would be appropriate. Thank you, Your Honors. Thank you very much. I think it needs to be our investigators or the analysts who submitted it. I'm sure it makes sense. Thank you both. Thank you.
judges: Berzon, Clifton, Garbis